**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

                                              Case No. 3:15-bk-30892-SHB

SAMUEL ROBERT MORTON, JR.
SHARON K. MORTON

              Debtors


**MEMORANDUM ON
MOTION OF BANK OF CAMDEN
<u>FOR RELIEF FROM THE AUTOMATIC STAY</u>**


**APPEARANCES:**    LACY, PRICE & WAGNER, P.C.
                        James H. Price, Esq.
                        249 North Peters Road
                        Suite 101
                        Knoxville, Tennessee  37923
                        Attorneys for Debtors

                     GENTRY, TIPTON & MCLEMORE, PC
                        Maurice K. Guinn, Esq.
                        Post Office Box 1990
                        Knoxville, Tennessee 37901
                        Attorneys for Bank of Camden

                     SAMUEL K. CROCKER, ESQ.
                     UNITED STATES TRUSTEE
                        Kimberly C. Swafford, Esq.
                        Howard H. Baker, Jr. United States Courthouse
                        800 Market Street
                        Suite 114
                        Knoxville, Tennessee  37902
                        Attorneys for United States Trustee


**SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court on the Motion of Bank of Camden for Relief From the Automatic Stay ("Motion for Stay Relief") filed on May 14, 2015, seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and/or (d)(2). The evidentiary hearing on the Motion for Stay Relief was held June 23 and 24, 2015. The record to be considered consists of Stipulations filed on June 15, 2015; forty-two exhibits admitted into evidence; and the testimony of six witnesses: Spike McCamy, Chad Benton, Charles Michael Smith, Robert Webb, Crystal Pate, and Samuel Robert Morton, Jr.[1] This is a core proceeding. 28 U.S.C. § 157(b)(2)(G).

## I. FACTS

Debtors executed a note payable to BankEast in the original principal amount of $2,418,000.00 ("First Note") on March 30, 2006. The First Note is secured by real property located at 1506 Callahan Drive, Knoxville, Tennessee, together with furniture, fixtures, and equipment (collectively "Jubilee Center Property") through a Construction Deed of Trust, Security Agreement, Assignment, Assignment of Leases and Rents, and Fixture Filing and a Collateral Assignment of Rents, Leases, Profits and Income. Debtors renewed the First Note in the principal amount of $3,051,317.00 on November 1, 2007, followed by eight subsequent modifications to increase the loan amount, extend the maturity date, or both. Debtors also executed a note in the amount of $55,000.00 ("Second Note") on September 30, 2009, which was likewise secured by the Jubilee Center Property.

Debtors filed their Chapter 11 case on March 24, 2015. As of the petition date, the indebtedness on the First Note was $4,434,166.95, and $29,271.94 was owed on the Second

---

[1] Because only Samuel Morton testified at trial, all references within this Memorandum to a singular Debtor concerning testimony will apply solely to Mr. Morton.

1

Note. Both notes are held now by Apex Bank, formerly known as Bank of Camden,[2] by virtue of an Assignment of Deed of Trust and Other Loan Documents from BankEast to U.S. Bank, effective January 27, 2012, and a Bill of Sale and Assignment of Construction Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing from U.S. Bank to Bank of Camden, both dated December 11, 2014. The Bank has an interest in cash collateral derived from rents on the Jubilee Center Property, which houses approximately fourteen tenants including a hair salon, a boutique, an alarm company, an accountant, a dance studio, a dog groomer, a window company, two photographers, a concrete company, National Branding Solutions, and Debtors' wholly owned business, Jubilee Banquet Facility, LLC ("JBF"). Debtors are permitted to use the cash collateral only in accordance with the terms of an Order entered on May 18, 2015; the Agreed Interim Order for Use of Bank of Camden's Cash Collateral entered on June 19, 2015; and the Second Agreed Interim Order for Use of Apex Bank's Cash Collateral entered on July 7, 2015, which extended the "authorized period" during which Debtors may use the Bank's cash collateral to the earlier of August 27, 2015, at 5:00 p.m. or entry of the court's order resolving the Motion for Stay Relief (collectively "Cash Collateral Orders").

Pursuant to the Joint Pretrial Statement, the court is to determine (1) whether cause exists to modify the automatic stay under § 362(d)(1) because the Bank's interest in the property is not being adequately protected because Debtors are not receiving rent from tenant JBF, which occupies approximately 13,500 square feet of the Jubilee Center Property, and (2) whether the Jubilee Center Property is necessary for an effective reorganization. Based on the testimony of witnesses at trial and the record as a whole, the court agrees that cause exists to modify the

---

[2] During her testimony, Ms. Pate, Vice President of Commercial Lending, testified that Bank of Camden is now known as Apex Bank. Although all documents filed prior to the trial of the Motion for Stay Relief refer to Bank of Camden, based on Ms. Pate's testimony, the court will refer to the creditor as Apex Bank within this memorandum.

automatic stay under subsection (d)(1) but disagrees with the Bank's contention under subsection (d)(2) that the Jubilee Center Property is not necessary for an effective reorganization.

## II. ANALYSIS

Motions for stay relief are governed by 11 U.S.C. § 362(d), which states, in material part:

(d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay —

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]

(2) with respect to a stay of an act against property under subsection (a) of this section, if –

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362.

### A.  Cause Under § 362(d)(1), Including Adequate Protection

Because the Bankruptcy Code does not expressly define the term "cause" in § 362(d)(1), what constitutes cause and whether it exists is determined through "a fact-intensive inquiry made on a case-by-case basis." *In re Shivshankar P'ship, LLC*, 517 B.R. 812, 817 (Bankr. E.D. Tenn. 2014) (citations omitted); *see also Mooney v. Gill*, 310 B.R. 543, 546-47 (N.D. Tex. 2002) ("The bankruptcy court must balance the hardships of the parties and base a decision on whether to modify the automatic stay on the degree of hardship involved and the goals of the Bankruptcy Code.  Cause is an intentionally broad and flexible concept, made so in order to permit the courts to respond in equity to inherently fact-sensitive situations." (citations and quotation marks omitted)).  Adequate protection, however, is expressly addressed in the Bankruptcy Code, which provides that when adequate protection is required, it may be provided through payments,

3

additional or replacement liens, or any other relief that affords the creditor "the indubitable equivalent" of its interest in the secured property. *See* 11 U.S.C. § 361.

> The determination of whether a creditor's interest is adequately protected is not an exact science nor does it involve a precise arithmetic computation. Rather, it is pragmatic and synthetic, requiring a court to balance all relevant factors in a particular case, including the value of the collateral, whether the collateral is likely to depreciate over time, the debtor's prospects for a successful reorganization and the debtor's performance under the plan. Other considerations may include the balancing of hardships between the parties and whether the creditor's property interest is being unduly jeopardized. *In re Rogers*, 239 B.R. 883, 887 (Bankr. E.D. Tex. 1999) (citing *In re Olick*, 221 B.R. 146, 161 (Bankr. E.D. Pa. 1998)). A secured creditor retains the right to "adequate protection" of its collateral, which means it is entitled to have the value of its collateral maintained at all times, and it can obtain relief from the automatic stay and take back its collateral at any time if that interest is not adequately protected or for other "cause." *Price v. Del. State Police Fed. Credit Union (In re Price)*, 370 F.3d 362, 373 (3d Cir. 2004).

*In re Bushee*, 319 B.R. 542, 551-52 (Bankr. E.D. Tenn. 2004).

Apex Bank "must show that there has been a decline (or at least that there is a real threat of decline) in the value of the collateral at issue; only upon a showing does the burden shift to the debtor to prove that the collateral at issue is not, in fact, declining in value." *In re AMR Corp.*, 490 B.R. 470, 477 (S.D.N.Y 2010). Nevertheless, although "failure to provide adequate protection when the property is declining in value is a classic basis for granting relief from the stay for cause . . . , [w]ithout quantifying the decline in value, the creditor can often establish its prima facie case by demonstrating that the debtor has completely failed, or substantially failed to make post-petition payments." *In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 333 (Bankr. S.D.N.Y. 2001) (quoting *In re Elmira Litho, Inc.*, 174 B.R. 892, 903 (Bankr. S.D.N.Y. 1994)).

The Bank's argument that its interests are not adequately protected centers around the fact that JBF, which occupies approximately 13,500 square feet in the Jubilee Center Property (consisting of a total of 33,257 rentable area), does not pay rent that would constitute the Bank's

4

cash collateral. In response, Debtors argue that because they are making adequate protection payments of $9,394.00 to the Bank and setting aside $4,000.00 monthly for taxes, Apex Bank cannot demonstrate that its interest in the Jubilee Center Property is diminishing. Debtors also argue that as long as they are making the required adequate protection and tax payments, their failure to collect rents from JBF does not impact the value of the Bank's security interests.

At trial, Debtor testified that in 2012, JBF signed a lease agreement of $6,500.00 per month, which rent it has never paid. Debtor testified that in lieu of JBF's paying rent, he personally provides property management services for the Jubilee Center Property without charging or taking a management fee, and JBF pays the following monthly expenses that benefit the property and all of its tenants as a whole: (1) $250.00 for the parking lot lights; (2) $103.00 for trash receptacles; and (3) $75.00 for pest control. He contended that this financial arrangement is in the best interests of everyone – the tenants, the bankruptcy estate, even the Bank – because JBF, which provides catering services and hosts events and banquets, serves as the anchor tenant, the presence of which attracts and improves retention of other tenants to the Jubilee Center Property, maximizes the market rent paid by other tenants, and increases customer traffic and sales for other tenants.

The court disagrees with Debtors' position that they need not collect rent from JBF. Debtor testified that thus far in 2015, JBF is operating ahead of its income stream from the same time in 2014 and is on course to net approximately $75,000.00 in 2015. When asked what monthly payments could be made to the Bank based on whether they received rent from JBF, Debtor testified that the payments to Apex Bank would be approximately $15,000.00 if rent was received from JBF and approximately $11,000.00 if not. The monthly expenses that Debtor attributes to being paid by JBF to the benefit of the Jubilee Center Property total $428.00

5

($5,136.00 annually). Based on the rent roll included in Mr. Benton's appraisal report, which reflects an annual actual rental income of $285,780.00, including annual rental from JBF in the amount of $78,000.00, the court figures an appropriate 4% management fee[3] payable to Debtor of $11,431.20, or $952.60 monthly.[4] Adding together the monthly expenses that have been borne by JBF and the management fee on the total rent, however, produces a sum of only $1,380.60 per month. Deducting that from the $6,500.00 JBF lease payment yields a difference of $5,119.40, which translates to an annual loss of cash receipts to Debtors (and to the bankruptcy estate, the value of which debtors-in-possession have a fiduciary duty to maximize for the benefit of creditors[5]) and a decrease in the value of Apex Bank's security in the amount of $61,432.80.[6]

Notwithstanding their pre-petition business decision not to collect rent from JBF, Debtors' failure to do so since the filing of their bankruptcy case unquestionably constitutes cause to modify the automatic stay for a lack of adequate protection. Furthermore, by not enforcing the existing lease with JBF, Debtors have breached their fiduciary duty as debtors-in-possession to maximize the Jubilee Center Property's rents for the benefit of their bankruptcy estate as well as for the benefit of Apex Bank. *See Sergent v. McKinstry,* 472 B.R. 387, 409

---

[3] The court arrived at 4% by averaging the management fee percentages testified to by the expert witnesses. The Bank's first expert, Mr. McCamy, testified that a 3.5 to 5% rate would be appropriate. Similarly, the Bank's second expert, Mr. Benton, testified that a typical management fee would be 3 to 5%. Debtors' expert, Mr. Smith, testified that he would expect a 3% management fee.

[4] The Operating Reports for the Jubilee Center Property for April and May 2015 reflect $16,610.00 actual rent collected and do not include any rent from JBF. A 4% management fee collected on the actual monthly rent received would be $664.40 ($7,972.80 annually).

[5] *See Sergent v. McKinstry*, 472 B.R. 387, 409 (E.D. Ky. 2012) (explaining the fiduciary duty to maximize the value of the estate (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985)).

[6] The court also finds it troubling that JBF's tax return for 2013 reflects that it paid $54,000.00 in rent. When questioned about this figure, Debtor testified that the funds were "contributions" to the Jubilee Center Property that Debtors then attributed to rent, including payment of the 2012 property taxes, construction of a couple of buildouts, and supplemental funds for the Jubilee Center Property's operations. The 2014 tax return, however, lists $0.00 for rents.

6

(E.D. Ky. 2012).  Likewise, Debtors' post-petition payments of $1,000.00 monthly to Mrs. Morton's mother, Dixie Bopp, on an unsecured, nonpriority, pre-petition debt reflect at least a basic misunderstanding by Debtors as to what may be paid as regular monthly expenses, adding to the grounds for cause to modify the stay under subsection (d)(1).  Finally, cause exists based on Debtors' failure between May 18 through the date of the June 23 trial to comply with the terms of the Cash Collateral Orders requiring an accounting every two weeks and the timely filing of monthly operating reports.  Although Apex Bank received the April and May information from Debtors on June 4, 2015, it had not received any further accountings as of the June 23 trial date.  Similarly, between the March 24, 2015 petition date and the date of trial, Debtors had not timely filed their monthly operating reports, necessitating the filing of the Motion of United States Trustee to Dismiss or Convert or, in the Alternative, Compel Future Compliance on June 1, 2015.[7]

## B.  Necessary for an Effective Reorganization

Apex Bank also seeks stay relief under § 362(d)(2), arguing that the Jubilee Center Property is not necessary for an effective reorganization because Debtors cannot propose a plan that has a reasonable likelihood of confirmation, they cannot satisfy the fair and equitable requirements of § 1129(b) because they do not have the ability to pay the Bank's claims, and in the event the Bank makes the § 1111(b)(2) election, they cannot propose a plan that would provide for the Bank to retain its lien to the extent of its allowed claims ($4,463,437.89), pay to the Bank deferred cash payments with a present value of the Bank's interest in the property, and pay to the Bank deferred cash payments totaling at least the allowed amount of its claims.  In

---

[7] The Monthly Operating Reports for April and May 2015 were filed on June 18, 2015, mere moments before the initial hearing on the motion to dismiss or convert. An Order resolving the United States Trustee's motion was entered on July 6, 2015, requiring, *inter alia*, monthly operating reports to be timely filed no later than the 15th day of each month barring exigent circumstances and agreement of the United States Trustee, timely filing of the Substantial and Controlling Interest Reports on May 1 and November 1, and timely payment of the quarterly fees to the United States Trustee.

7

opposition, Debtors argue that they cannot reorganize without the Jubilee Center Property, that the exclusivity period has not expired and they have not been given an opportunity to propose a plan in an attempt to reorganize, and that a successful reorganization is plausible based on their income sources.

Because Debtors concede that there is no equity in the property, in order to satisfy the requirements of § 362(d)(2)(B) and prevent relief from the stay, Debtors must establish that they are attempting to reorganize within a reasonable time, that reorganization is feasible, and that the Jubilee Center Property is necessary for reorganization. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988). To satisfy this requirement, Debtors must do more than assert that they cannot reorganize without the collateral; at a minimum, they must show that they are "moving meaningfully to propose a plan of reorganization" that has a "realistic chance of being confirmed." *In re Ashgrove Apts. of Delakb County, Ltd.*, 121 B.R. 752, 756-57 (Bankr. S.D. Ohio 1990). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect." *Timbers*, 484 U.S. 375-76.

Nevertheless, while the burden of proof of reorganization is fact-intensive, it is also "less stringent in the early stages of the bankruptcy case, and a secured creditor may be expected to bear some reasonable delay while the debtor is moving meaningfully to propose a plan." *Shivshankar*, 517 B.R. at 821 (quoting *Sumitomo Trust & Banking Co. v. Holly's Inc. (In re Holly's Inc.)*, 140 B.R. 643, 699-701 (Bankr. W.D. Mich. 1992)). When the exclusivity period has not yet run, courts apply a lesser standard of proof "to benefit debtors who have a realistic chance of reorganization but who have not had sufficient time to formulate a confirmable plan."

8

*Am. Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc.)*, 203 B.R. 432, 442 (N.D. Ind. 1996) ("During the early stages of a bankruptcy case, the court 'must work with less evidence than might be desirable and should resolve issues in favor of the reorganization where the evidence is conflicting' to ensure that the debtor is given the 'breathing room' Congress intended the stay to provide." (quoting *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980))).

Unquestionably, Debtors require the Jubilee Center Property to effectively reorganize, leaving plausibility as the sole issue under subsection (d)(2). Although Debtors have yet to propose a plan,[8] Debtor offered evidence at trial of their prospects for funding a plan, testifying that any plan will be funded through post-petition income derived from the Jubilee Center Property; the management fee he receives from S.R. Morton Properties, which involves two warehouse facilities; the benefits he receives from the Veterans Administration; income derived from JBF; and real estate commissions derived from his real estate license. Concerning the management income, Debtor testified that both warehouses have long-term tenants who are current, that the Jubilee Center Property has thirteen outside tenants, and that JBF is currently producing higher revenues than at this time in 2014, has a number of extra events already scheduled, and is on target to earn more in 2015 than in 2014 with an approximate anticipated profit of $75,000.00. Debtor also testified that Debtors are willing to change their rent structure with JBF, that they will attempt to restructure their mortgage obligations to be more favorable, and that they will cut personal expenses if necessary in order to make a plan work.

---

[8] The exclusivity period will expire on July 22, 2015; however, throughout the pendency of this bankruptcy case thus far, a number of procedural and substantive issues have arisen relating to representation of Debtors by their initial bankruptcy counsel, and they have been defending this Motion, which was filed fifty-one days after the case was filed. Debtors have since resolved their representation issues by obtaining new counsel, and the court takes judicial notice that they have sought to extend the exclusivity period in light of this new representation.

9

Without a plan having actually been proposed, the court is in the position of ascertaining whether Debtors can potentially reorganize based solely on testimony and roughly two months of monthly operating reports and bank statements.  Taking into account the fact that Debtors are now represented by new counsel who has undertaken a number of steps that have convinced the court that Debtors, in fact, are attempting to move in the direction of proposing a plan that can be confirmed, the court finds that stay relief is not appropriate under subsection (d)(2).

### III.  CONCLUSION

Having determined that cause exists to modify the stay pursuant to § 362(d)(1), the Motion for Stay Relief will be granted.  "The court has discretion, however, to condition the automatic stay instead of lifting it outright." *Shivshankar*, 517 B.R. at 823.  The stay, accordingly, will be modified and conditioned on the following:

(1) Debtors must file a proposed plan of reorganization no later than ninety (90) days from the date of entry of the Order granting Apex Bank's Motion for Stay Relief.  Affording Debtors an opportunity to work with their newly hired counsel to propose a plan offers them an opportunity to reorganize without prejudicing them for the mistakes made during the course of the prior representation, but also protects Apex Bank and all other creditors by imposing such a deadline. *See, e.g., In re Trigee Foundation, Inc.*, No. 12-00624, 2013 WL 1401889, at *4, 2013 Bankr. LEXIS 1432, at *11 (Bankr. D. Colo. Apr. 8, 2013).

(2)  Debtors must obtain confirmation of a plan of reorganization no later than November 30, 2015.  In the event a plan has not been confirmed by this date, the automatic stay will be lifted as to Apex Bank to allow it to foreclose its liens encumbering the Jubilee Center Property without further notice or hearing.

(3) Debtors shall provide Apex Bank, through its attorneys or designated representative, copies of all bank statements and rental revenues, together with its monthly operating reports, filed with the court by the 15th day of each month.

(4) Effective beginning August 1, Debtors shall collect from JBF monthly rent of $6,500.00, and Debtors shall be allowed a management fee of 4% calculated on gross rents for the Jubilee Center Property.

(5) With the increase in rents, the cash collateral of Apex Bank will increase, resulting in the need for a determination of whether the monthly adequate protection payment should increase. This issue will be heard on August 13, 2015, at 10:00 a.m., with Debtors' Motion for Modification of Second Agreed Interim Order for Use of Apex Bank's Cash Collateral, filed July 15, 2015. The Cash Collateral Orders will remain in effect until that time, and Debtors must continue making all payments as required therein.

Notwithstanding the provisions of paragraphs (1) and (2) above, on motion of Apex Bank containing certification that any of the above conditions have not been met or that the value of its collateral otherwise has been placed in jeopardy, and after notice and an expedited hearing, the automatic stay may be modified to allow Apex Bank to foreclose its lien encumbering the Jubilee Center Property.

An Order consistent with this Memorandum will be entered.

FILED: July 17, 2015

BY THE COURT

*/s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE