## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                                   Case No. 3:15-bk-30892-SHB

SAMUEL ROBERT MORTON, JR.
SHARON K. MORTON

                Debtors

## MEMORANDUM OPINION

**APPEARANCES:**    LACY, PRICE & WAGNER, P.C.
                   James H. Price, Esq.
                   249 North Peters Road
                   Suite 101
                   Knoxville, Tennessee  37923
                   Attorneys for Debtors

                SAMUEL K. CROCKER, ESQ.
                UNITED STATES TRUSTEE
                   Kimberly C. Swafford, Esq.
                   David Holesinger, Esq.
                   Tiffany A. DiIorio, Esq.
                   Howard H. Baker, Jr. United States Courthouse
                   800 Market Street
                   Suite 114
                   Knoxville, Tennessee  37902
                   Attorneys for United States Trustee

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

On June 24, 2015, the Court entered an order directing James H. Price and Chadwick B.

Tindell, who were at that time counsel for Debtors, to appear and show cause why they should

not be sanctioned, including but not limited to a directive to disgorge fees, pursuant to 11 U.S.C.

§ 105(a) and Rule 9011 of the Federal Rules of Bankruptcy Procedure ("Show-Cause Order").

[Doc. 158.]  The Show-Cause Order was issued in response to a number of procedural and

substantive errors in violation of the Local Rules of the Bankruptcy Court for the Eastern District

of Tennessee ("E.D. Tenn. LBR"), the Administrative Procedures for Electronic Case Filing for

the United States Bankruptcy Court for the Eastern District of Tennessee ("ECF Administrative

Procedures"), and the Federal Rules of Bankruptcy Procedure committed by Mr. Price and Mr.

Tindell in their representation of Debtors.  The final straw resulting in issuance of the Show-

Cause Order was the alarming testimony of Debtor Samuel K. Morton ("Mr. Morton") during the

trial held on June 23, 2015, on the Motion of Bank of Camden for Relief From the Automatic

Stay ("Motion for Stay Relief") that Debtors' counsel had not obtained, as of that date, Debtors'

original signatures on their bankruptcy petition, statements, or schedules that were filed in March

2015, or on any of the subsequently filed amendments.

An evidentiary hearing on the Show-Cause Order was held July 13, 2015,[1] at which time

the Court heard the testimony of Debtors as well as the explanations and arguments of Mr. Price

and Mr. Tindell.  The Court entered fourteen exhibits at the evidentiary hearing, and three late-

filed exhibits were submitted to the Court *in camera* on July 17, 2015.  In addition to the proof

tendered, the Court also takes judicial notice, pursuant to Rule 201 of the Federal Rules of

Evidence, of all documents of record filed in Debtors' bankruptcy case and all sworn testimony

given by either Mr. Morton or Mrs. Morton in any prior court proceeding or trial held in this

---

[1] An initial show-cause hearing was held on July 2, 2015, at which the Court granted counsel's request for more
time to prepare for an evidentiary hearing on the matter.

bankruptcy case. For the reasons set forth in this Memorandum, the Court has determined that sanctions are appropriate and will require Mr. Price, Mr. Tindell, and Lacy, Price & Wagner, P.C. (the "Firm") to disgorge the $15,000.00 retainer paid to them by Mrs. Morton's mother and to repay to Debtors' estate the payments totaling $6,000.00 received from Debtors in the ninety days before the filing of their case. The Court will also require Mr. Price and Mr. Tindell each to attend ten hours of ethics continuing legal education above what is required for maintaining their Tennessee law licenses, to be completed and certified to the Court no later than March 31, 2016. Finally, the Court will require Mr. Price and Mr. Tindell to self-report their conduct in this case and this Court's Memorandum Opinion to the Tennessee Board of Professional Responsibility on or before November 2, 2015, and provide evidence of such submission (including but not limited to a copy of the documents submitted) to this Court *in camera* on or before November 30, 2015.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This matter arises out of a litany of problems in this Chapter 11 case that was filed on March 24, 2015. The major impetus for this sanctions proceeding against Debtors' initial counsel were revelations that they had filed documents bearing the electronic signatures of Debtors when Debtors had not actually signed any documents and counsel's piecemeal disclosure of significant connections with Debtors, including pre-petition debt owed by Debtors and/or their related entities in an  amount exceeding $150,000.00 and potential preferential payments made by Debtors to counsel in the amount of $6,000.00, only after such connections were unexpectedly discovered by the United States Trustee or the Court. The following facts catalogue by category the series of problems with counsel's disclosures and counsel's competency.

A  **Non-Disclosures**

On April 2, 2015, Mr. Price and Mr. Tindell[2] filed the Application by Debtors-in-Possession for Approval of Employment of Bankruptcy Counsel ("Application to Employ"), accompanied by Mr. Price's Unsworn Declaration Under Penalty of Perjury ("Declaration"), through which Debtors sought to employ Mr. Price, Mr. Tindell, and the Firm.  The Application to Employ also sought approval of compensation for Mr. Price and Mr. Tindell each at a rate of $300.00 per hour, asserting that both "attorneys have significant experience with regard to bankruptcy, reorganization and other matters under the Bankruptcy Code and Rules"; that the Firm was disinterested and held no adverse interest to Debtors; and that the Firm was holding a $15,000.00 retainer in its trust account. [Doc. 31-1.]  The corresponding Declaration stated that Mr. Price and the Firm were "disinterested persons within the meaning of 11 U.S.C. § 101(14)[,]" that they "do not hold or represent an interest adverse to the Debtors and are eligible to serve as counsel for the Debtors pursuant to the provisions of 11 U.S.C. § 327(d)[,]" that the Firm had received a $15,000.00 retainer, and that the Firm "is not a creditor of the Debtors[.]" [Doc. 31-2.]  The Court rejected the order accompanying the Application to Employ "because the certificate of service on the application was incomplete in that it did not attach the referenced mailing matrix" and advised that until an amended certificate of service was filed, the Application to Employ would not be considered. [Doc. 33.]  Counsel complied on April 3, 2015, by filing a Certificate of Service reflecting service of the Application to Employ and Declaration.

---

[2] Although the Court recognizes that most of the court filings were made under Mr. Price's ECF account, Mr. Tindell was co-counsel of record and actively participated in the case, making his first court appearance in the case at the first hearing on April 9, 2015.  Indeed, his participation in this case alerted the clerk's office that his ECF contact information had not been updated as required by the ECF Administrative Procedures since he joined the Firm, and he repeatedly failed to respond to the clerk's request to correct his contact information for his ECF account until June 23.  Given Mr. Tindell's active participation in the case and his experience practicing before this Court since at least 1999, the Court holds him equally accountable for the misfeasance in this case.

After Bank of Camden, now Apex Bank,[3] responded to the Application to Employ,

stating that it would not agree to payment of attorneys' fees from its cash collateral and objecting

to the $300.00 hourly rate, Debtors filed an Amended Application by Debtors-in-Possession for

Approval of Employment of Bankruptcy Counsel ("Amended Application to Employ"), reducing

the proposed hourly rates to $250.00.[4]  In addition to docketing problems with the Amended

Application to Employ,[5] counsel also submitted a non-compliant proposed order that violated

section V.B.1 of the ECF Administrative Procedures requiring all proposed orders to have a four-

inch top margin to allow for the Court's signature block.  As a result, the Court rejected the order

on the Amended Application to Employ. [Doc. 51.]

The passive notice deadline on the Amended Application to Employ expired on April 27,

2015; however, because of the numerous problems in the case and because the cash collateral

issue raised by Apex Bank had not been resolved, the Court noticed the Application to Employ,

the response filed by Apex Bank, and the Amended Application to Employ for hearing on May

21.  One week after the hearing was noticed, Mr. Morton testified at the meeting of creditors that

Debtors owed pre-petition legal fees to the Firm in the amount of $150,000.00.  As a result,

notwithstanding that the objection time had passed, the United States Trustee filed an objection

to the Amended Application to Employ, notifying the Court of the previously undisclosed pre-

petition debt, which violated the requirements for disclosure of all connections with debtors

---

[3] Although the creditor was called Bank of Camden throughout the majority of the time and events that this Memorandum addresses, because it is now called Apex Bank, all references herein to the entity formerly known as Bank of Camden shall be to Apex Bank.

[4] The Amended Application to Employ recites that counsel agreed to reduce their rates after consultation with the United States Trustee's office.

[5] The Amended Application to Employ, which included passive notice under E.D. Tenn. LBR 9013-1(h)(1)(xiv), was filed incorrectly with a hearing date, requiring the clerk's office to edit the docket entry to reflect the objection deadline and remove the hearing date.

contained in Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, and arguing that Mr.

Price, Mr. Tindell, and the Firm were not, in fact, disinterested under 11 U.S.C. § 327(a), as

defined by 11 U.S.C. § 101(14).[6]

The day before the May 21 hearing, in response to the United States Trustee's objection

to counsel's employment filed nine days earlier, Debtors filed a third iteration of the Application

to Employ ("Second Amended Application to Employ"), disclosing the existence of the pre-

petition legal fees owed to the Firm by Debtors and their closely-held limited liability

companies:  Jubilee Center, LLC; Jubilee Banquet Facility, LLC; Morton Construction, LLC;

and S.R. Morton Properties, LLC.  The Second Amended Application to Employ declared that

all of the outstanding pre-petition attorneys' fees had been waived by the Firm with respect to

Debtors and their related entities.  In the Amended Unsworn Declaration Under Penalty of

Perjury ("Amended Declaration") submitted in support of the Second Amended Application to

Employ, Mr. Price stated that "[p]rior to the filing of this case, certain attorneys [*sic*] fees were

owed to the Firm by the Debtors and/or entitles related to the Debtors.  All prepetition attorneys

[*sic*] fees owed by the Debtors and entities related to the Debtors have been waived and are no

longer due or payable." [Doc. 78-2.]  The Amended Declaration did not contain Mr. Price's

original signature as required by section III.A.2 of the ECF Administrative Procedures, and he

was later ordered to cure the deficiency.[7]  Following the hearing on May 21, 2015,[8] at which the

---

[6] Contemporaneously with its objection to the Amended Application to Employ, the United States Trustee filed a motion to extend time to file its objection along with a motion to shorten time for hearing on the motion to extend time so that the motion and objection could be heard on May 21, the date already set by the Court for hearing on the Application to Employ, Apex Bank's response thereto, and the Amended Application to Employ.

[7] As a result of the revelation at the stay-relief trial about the lack of original signatures by Debtors, the Court discovered the problem with the Amended Declaration and ordered Mr. Price to file a Second Amended Declaration to comply with the original-signature requirement.

[8] At the May 21 hearing, the Court voiced concern about granting the Second Amended Application to Employ, but because the United States Trustee withdrew his objection after counsel waived the pre-petition debt, the Court

United States Trustee withdrew his objection to employment, the Court entered an order on May

22 granting the Second Amended Application to Employ "*nunc pro tunc* to May 20, 2015, the

date of the second amended application *that disclosed all material information concerning the*

*disinterestedness of counsel.*"[9] [Doc. 83 (emphasis added).]

During the June 23, 2015 trial on Apex Bank's Motion for Stay Relief, Mr. Morton

testified that Debtors had been making regular monthly payments of $2,000.00 to the Firm in the

year preceding the bankruptcy filing, including the ninety-day preference period.  These

payments, however, were not disclosed in Debtors' Statement of Financial Affairs, in any of the

applications to employ counsel, or in any of Mr. Price's declarations filed in connection with the

applications to employ.  Based on this testimony, the Court entered an order on June 25, 2015,

directing Mr. Price and Mr. Tindell to appear and show cause why they "should not be

disqualified as counsel for Debtors in this case for an actual conflict of interest under the

Tennessee Rules of Professional Responsibility arising due to an apparent preferential payment

made to them by Debtors and/or misrepresentation concerning their disinterestedness as required

by 11 U.S.C. § 101(14)." [Doc. 161.]

Subsequently, Debtors filed an Amended Statement of Financial Affairs on June 29,

2015, disclosing, *inter alia*, that between January and March 2015, they had paid $2,000.00

monthly to the Firm.  As directed by the Court because the Amended Declaration did not bear his

signature, Mr. Price filed his Second Amended Declaration, also including the information that

had been revealed in testimony about Debtors' pre-petition payments to counsel, stating "[o]ut of

---

ultimately granted the Second Amended Application to Employ.  The Court also expressly noted the multiple errors
in the case to that point and informed Mr. Price that he was "on a short leash" and the errors must cease.

[9] Although required by E.D. Tenn. LBR 9072-1, a proposed order was not attached to the Second Amended
Application to Employ when it was filed.  Less than one hour before the May 21 hearing, Debtors' counsel
incorrectly filed and docketed (rather than uploading, as required by the ECF Administrative Procedures) a proposed
order as a "tendered proposed order."

an abundance of caution, the Firm states that within ninety (90) days of the filing Debtors made

three (3) monthly payments to the Firm totaling Six Thousand Dollars ($6,000.00).  The

payments were the same monthly payments made for more than one (1) year prior to filing the

Petition in this case and were partial payments and in the ordinary course for new value for the

work being performed contemporaneously by the Firm for services unrelated to this proceeding."

[Doc. 176 at ¶ 3.]

On June 30, 2015, the United States Trustee filed a brief in support of the Court's show-

cause orders concerning disqualification and sanctions, including the disgorgement of fees,

asserting that both were appropriate because (1) Mr. Price and Mr. Tindell had twice failed to

disclose significant connections with Debtors that exposed the existence of either actual or

potential conflicts of interest and (2) through their repeated non-compliance with the procedural

rules and filing requirements, both attorneys had failed to demonstrate the requisite competence

and care required to represent Chapter 11 debtors.

### B.   Unsigned Documents

Debtors' bankruptcy case was initiated when Mr. Price filed, on behalf of Debtors, the

Voluntary Petition, bearing Debtors' electronic signatures "under penalty of perjury that the

information provided in this petition is true and correct." [Doc. 1.]  The next day, Mr. Price filed

Debtors' Statement of Social Security Number(s), List of Creditors Holding 20 Largest

Unsecured Claims, and Verification of Creditor Matrix, each of which was required to have been

(but was not) filed with the Voluntary Petition commencing the case and each of which

contained Debtors' electronic signatures "under penalty of perjury that the foregoing is true and

correct."  Two days after filing the Voluntary Petition, Mr. Price filed both Debtors' Exhibit D –

Individual Debtor's Statement of Compliance With Credit Counseling Requirement; the

Statement of Financial Affairs; Schedules B, D, E, F, G, and H; and the Certification of Notice to

Consumer Debtor(s) Under § 342(b) of the Bankruptcy Code, all of which contained Debtors'

electronic signatures under penalty of perjury.  Mr. Price filed the requisite Certificates of Credit

Counseling for both Debtors the following day.

While being examined by counsel for Apex Bank during the June 23 trial on the Motion

for Stay Relief, Mr. Morton testified that he and Mrs. Morton had not actually signed hard copies

of their bankruptcy petition, statement, schedules, or any of the subsequent amendments.  During

the lunch recess of the hearing, the Court entered an order formalizing its oral direction to Mr.

Price and Mr. Tindell before the recess to produce the original documents with Debtors' "wet"

signatures when the trial reconvened for the afternoon.  At the beginning of the afternoon court

session, Mr. Tindell advised the Court that there were no such documents to be produced.[10]

In response to this information, the Court directed that Debtors were required to sign their

statements, schedules, and declarations before the close of court that day to cure the deficiency,

which they did.  Because counsel had not obtained Debtors' signatures on documents requiring

actual signatures before the filing of such documents bearing electronic signatures, on June 24,

the Court entered an order rescinding application of Section III.A.3 of the ECF Administrative

Procedures with respect to Mr. Price and Mr. Tindell, such that they were no longer permitted to

file any documents in Debtors' case that did not contain Debtors' original signatures rather than

electronic signatures.

---

[10] Mr. Tindell also advised the Court that he had updated his email address with the clerk's office for ECF notices in
response to two separate requests to do so from the clerk's office.

C.    **Incompetence**

1. *Filing of Complete Statements, Schedules, and Monthly Operating Reports*

From the outset, counsel's handling of this case created problems for the Court. Because the Summary of Schedules; Official Form B22B; Schedules C, I, and J; and the Payment Advices Statement were not filed with the Petition, the Court entered an Order Regarding Certain Unfiled Documents on March 27, 2015, directing Debtors to file the missing documents by April 7, and advising that the failure to do so "will constitute cause for dismissal of this case, see 11 U.S.C. §§ 521(i), . . . 1112(b) and (e) . . . , and the court may, without further notice, enter an order summarily dismissing this case." [Doc. 22.] Also on March 27, the clerk's office sent a memorandum to Mr. Price advising him to file the statement disclosing his compensation within fourteen days from the date the petition was filed. Schedules C, I, and J; Official Form B22B; the Summary of Schedules; the Statement Regarding Payment Advices or Other Evidence of Payment; and the Disclosure of Compensation of Attorney for Debtors were subsequently filed on April 7, which was the deadline set forth in the March 27 order and clerk's memorandum.

At the meeting of creditors in early May, the United States Trustee directed Debtors to amend their schedules and provide other required information. On June 1, the United States Trustee filed the Motion of United States Trustee to Dismiss or Convert or, in the Alternative, Compel Future Compliance ("Motion to Dismiss"), stating that Debtors (1) had not timely filed the monthly operating report required by E.D. Tenn. LBR 3015-2 for April 2015; (2) had not timely filed a Substantial/Controlling Interest Report as required by Rule 2015.3 of the Federal Rules of Bankruptcy Procedure and as requested in an email to counsel and again at the meeting of creditors; (3) had not amended their Statement of Financial Affairs and schedules to correct and include information as requested during the meeting of creditors; and (4) had not provided

the United States Trustee with bank account statements as requested at the initial debtor conference, again in two separate emails, and once more at the meeting of creditors. The United States Trustee also filed an objection to exemptions on June 1, arguing that Debtors' claimed exemptions under Tennessee Code Annotated § 26-2-103 exceeded the amounts allowable under the law.

Less than thirty minutes before the scheduled hearing on the Motion to Dismiss on June 18, Debtors' counsel filed the Substantial/Controlling Interest Report (consisting of nineteen pages) and the April and May monthly operating reports (consisting of 121 and 141 pages, respectively).[11] Because the United States Trustee offered to allow Debtors two additional weeks to provide information that was the subject of the Motion to Dismiss, the Court reluctantly[12] continued the hearing on the Motion to Dismiss to July 2.

On June 22, Debtors' counsel collectively filed "amended" Schedules A, B, C, D, E, and F. By order entered June 24, these documents were stricken because they did not comply with (1) E.D. Tenn. LBR 1009-1(a) requiring that all amended schedules be verified by the debtor and include the word "amended" in the title; (2) E.D. Tenn. LBR 1009-1(b) requiring a certificate of service on the United States Trustee and any affected entity, and on all creditors when Schedule C is amended; and (3) E.D. Tenn. LBR 1009-1(c) requiring payment of a $30.00 fee to amend any schedule adding additional creditors or changing a creditor's classification and requiring service on all affected creditors and the United States Trustee. The $30.00 fee for the stricken "amended" schedules was paid on June 26. On June 30 – only after the Court ordered Debtors to sign all documents that previously had been filed with their electronic signatures and barred Mr.

---

[11] On June 19, 2015, the Court entered an order directing Debtors, within three days, to amend the certificates of service for the April and May monthly operating reports to reflect proper service on the United States Attorney and the Internal Revenue Service in accordance with E.D. Tenn. LBRs 2002-2(b) and 2083-1. The Amended Certificate of Service was filed one day late, on June 23.

[12] The Court again chastised Debtors' counsel about their failure to appropriately handle the case.

Price and Mr. Tindell from filing documents bearing Debtors' electronic (as opposed to original) signatures – Debtors' counsel filed the Amended Statement of Financial Affairs signed by Debtors and Amended Schedules A, B, C, D, E, F, G, and H, along with an Amended Summary of Schedules and an Amended Declaration Concerning Debtor's Schedules, all of which bore Debtors' original signatures.  Once again, the required $30.00 filing fee was not paid at the time of the filing; however, it was paid on July 2.

The United States Trustee and the Court were not the only entities inconvenienced by Debtors' counsel's errors.  Two days after the United States Trustee filed his Motion to Dismiss, the City of Knoxville filed a motion to compel, asking the Court to order Debtors to amend Schedules D and E concerning the City's claim.  This motion was set for hearing on July 2; however, the City of Knoxville withdrew it on June 22, after Debtors filed the "amended" schedules that were subsequently stricken on June 24.

### 2.  *Cash Collateral Issues*

On April 3, Debtors filed a motion to use the cash collateral of Apex Bank and requested "an emergency hearing" for April 9; however, the notice of hearing legend appearing on the face of the motion gave the address for the clerk's office rather than the courtroom, requiring the deputy clerk to edit the Court's docket text to reflect the correct information.  At the April 9 hearing, the Court directed Debtors' counsel to submit an agreed order providing for the interim use of cash collateral; extending the "authorized" period to the close of business on May 21, 2015; and setting a final hearing on the motion for May 21, with objections to be due by May 14.  No such order was submitted until late on May 14 – *i.e.*, not until the day after the Court entered an order directing that an appropriate order be uploaded within five days. [13]  Although the

---

[13] Apex Bank had filed a corollary motion for adequate protection that was also heard on April 9, and the parties advised the Court that an agreed order resolving both motions would be tendered.  When no such order was

proposed agreed order provided for a May 21 hearing, it provided for objections to be due five

days prior, which not only contradicted the Court's directive at the April 9 hearing but made it

impossible for creditors to receive adequate notice before objections would be due.  Because the

agreed order was not timely tendered and did not contain the correct provisions as directed on

April 9, the order was not entered until May 18, 2015, and the Court was required to edit the

order to (1) change the nature of the May 21 hearing to a status conference; (2) schedule the final

hearing on the use of cash collateral for June 18, with objections to be filed no later than June 4;

(3) extend the "authorized period" for use of cash collateral to June 18, at 5:00 P.M.; and (4)

direct Debtors' counsel to serve the order as required by E.D. Tenn. LBR 4001-1(b)(5) and

certify service within three days of entry.

 During this same time period, Debtors and United Cumberland Bank were negotiating

use of cash collateral,[14] and on April 29, United Cumberland Bank filed a motion for entry of an

agreed order authorizing use of cash collateral, providing the bank with adequate protection, and

granting post-petition liens.  The initial agreed order submitted with the motion was denied on

May 4 for non-compliance with E.D. Tenn. LBRs 1007-2(a), 2002-1(b), 2002-2(b), and 4001-

1(b) and the parties' failure to incorporate sufficient provisions concerning Debtors' post-petition

tax obligations as directed on April 9.  United Cumberland Bank filed a second motion for entry

of agreed order on May 29; however, that motion also was denied on June 3 for failing to comply

with E.D. Tenn. LBR 9013-1(h)(3)(iv) because the proposed agreed order contained an objection

---

submitted, the Court entered an Order on May 13, directing that an appropriate order be submitted within five days
or the relief sought by the Bank would be denied.  The May 18 order addressed both motions.

[14] Counsel for United Cumberland Bank appeared at the emergency hearing on April 9 and explained the creditor's
position on cash collateral that is distinct from the cash collateral of Apex Bank.  The Court noted that the only
pending matters concerned cash collateral of Apex Bank as no motion had been filed concerning any cash collateral
of United Cumberland Bank.  The Court directed that any agreed orders for the use of cash collateral must contain
certain provisions about timely filing of tax returns and payment of post-petition tax obligations, timely filing of
monthly operating reports, and timely payment of United States Trustee's fees.

deadline of less than fourteen days.  This denied order also directed the parties that any

resubmission of the motion either should contain a notice of hearing for June 18 or be filed no

later than June 3 so that it could include the fourteen-day passive notice required under E.D.

Tenn. LBRs 4001-1(b) and 9013-1(h)(1)(vi) and (h)(3)(iv).

United Cumberland Bank filed a third motion for entry of agreed interim cash collateral

order on June 3, and an agreed order was entered on June 8 that, *inter alia*, (1) provided for

Debtors' interim use of United Cumberland Bank's cash collateral; (2) set the final hearing for

June 18, with any objections to be filed no later than June 17; (3) required the timely filing of all

monthly operating reports with the failure to do so being cause for dismissal; and (4) directed

Debtors' counsel to serve the agreed order on the twenty largest creditors, all parties in interest

having requested notice, and as required by E.D. Tenn. LBR 2002-1(b), all secured creditors, the

United States Trustee, the United States Attorney, and the United States on behalf of the Internal

Revenue Service, with counsel to certify such within three days.  Debtors' counsel, however, did

not certify service of the June 8 agreed order, and on June 19, the Court entered an order

directing Debtors' counsel to appear and show cause why they had not complied with the agreed

order.  The certificate of service was not filed until July 2, after the show-cause hearing.

### 3. *Miscellaneous Issues*

On June 19, Debtors filed two documents entitled "Combined Application by Debtors-in-

Possession for Approval of Employment of Professionals and to Shorten Notice Time" through

which they sought permission to employ Robert Webb and Charles Smith, respectively, as expert

witnesses for the June 23 trial on Apex Bank's Motion for Stay Relief.  Both applications

improperly included a one-day passive notice not authorized by E.D. Tenn. LBR 9013-1 and an

identical statement that Debtors' counsel was unable to meet with each expert before Thursday,

June 18, to verify his assistance at trial. This statement, however, was contrary to the trial

testimony of Mr. Smith, who testified that he was contacted by Mr. Price early in the week and

had worked on very little else since the preceding Tuesday.[15] The Court entered an Order

Allowing Employment of Professionals on June 22, directing that Debtors could not use Apex

Bank's cash collateral to compensate either expert and that approval of employment did not

constitute admissibility of their testimony at the June 23 trial.

### D.    Show-Cause Hearing

On July 2, 2015, along with a number of other matters, including the continued Motion to

Dismiss, the Court held its initial show-cause hearing on the failure to file a certificate of service

as to the Interim Agreed Order with United Cumberland Bank, the failure to comply with court

orders, and the conflict-of-interest issues. Concerning the certificate of service, Mr. Price

assured the Court that it would be filed that day, and it was, in fact, filed on July 2. Additionally,

because Debtors had filed an application to employ different counsel to represent them in the

bankruptcy case on June 30, the conflict-of-interest issues were likewise resolved. With respect

to counsel's failure to comply with court orders, at their request for additional time and to

---

[15] Additional issues concerning Mr. Smith's employment arose, and a show-cause hearing was held on September 10 for the Court to ascertain whether he was, in fact, a disinterested person under 11 U.S.C. § 101(14) based on the existence of a potential claim owed to him by Debtors. Mr. Smith asked Mr. Price about payment of the potential claim before the filing of the application to employ Mr. Smith. Mr. Price advised that he would "check on it" and then directed Mr. Morton to discuss the issue with Mr. Smith. After those discussions, Mr. Morton informed Mr. Price that any invoice would not have been owed by Debtors. Although Mr. Price did not raise the issue again with Mr. Smith, Mr. Price prepared the application to employ Mr. Smith, and none of the potential issues (*i.e.*, "connections" under Federal Rules of Bankruptcy Procedure 2014(b)) were ever disclosed. Thus, although Mr. Price never agreed that Mr. Smith would be paid for the pre-petition appraisal that Mr. Smith thought he had performed relating to Debtors' property, Mr. Price did not adequately resolve the matter and did not disclose it to the Court. As a result, the Court vacated the order granting the application to employ Mr. Smith and denied his application for fees. [Doc. 255.]

accommodate Debtors and the parties in interest, the Court scheduled an evidentiary hearing for July 13.[16]

At 4:55 P.M. on Friday, July 10 (*i.e.*, at nearly the eleventh business hour before the show-cause hearing set to begin at 1:30 P.M. on Monday, July 13), Mr. Price, Mr. Tindell, and the Firm filed a Response to Show Cause Order in which they apologized to the Court, acknowledged that errors were made, pointed out that they had suggested to Debtors that they retain new counsel to correct the conflict-of-interest problems, and stated that they had worked to cure all deficiencies. The Response to Show Cause Order also stated that the Firm had agreed to disgorge the entire $15,000.00 retainer received from Mrs. Morton's mother[17] and advised the United States Trustee that it would not file an application seeking any compensation or fees in this case.[18]

At the July 13 evidentiary hearing, both Debtors testified in response to questions by the Court. Mrs. Morton testified that she saw their bankruptcy petition before it was filed because

---

[16] Remarkably, on July 1 – *after* Debtors filed an application to employ new counsel – Mr. Price filed what he improperly termed a "Third Amended Application by Debtors-in-Possession for Approval of Employment of Counsel (For Litigation Outside Bankruptcy)," seeking for the first time approval of employment of Mr. Price, Mr. Tindell, and the Firm to represent Debtors in two state-court lawsuits. The application was supported by the re-filing of the Second Amended Declaration as an exhibit. This last application was withdrawn on July 2 following the Court's show-cause hearing at which the Court indicated that the application would not be approved unless filed by Debtors' newly-hired counsel. Another application to employ Mr. Price, Mr. Tindell, and the Firm has not been filed.

[17] The Response to Show Cause Order was the first instance of counsel disclosing in writing that Mrs. Morton's mother was the source of the retainer, as required by 11 U.S.C. § 329(a). Although the disclosure statement filed on April 7 disclosed that the source of the retainer was a "family member," the full disclosure as required by § 329(a) was not made in writing until the Response to Show Cause was filed. The Court first learned that Mrs. Morton's mother was the source of the retainer through Mr. Morton's testimony at the June 23 trial on Apex Bank's Motion for Stay Relief.

[18] At a hearing held on August 27, 2015, the Court was shocked to learn from Debtors' current counsel that neither the $15,000.00 nor the $6,000.00 had been repaid as promised because Mr. Price and Mr. Tindell were awaiting this Court's decision on the Show-Cause Order in the event the Court did not require said disgorgement. The Court finds this failure to return the funds prior to the Court's decision to be unsatisfactory and further cause for assessing sanctions. In the Court's opinion, the unqualified, "voluntary" disgorgement offered in an effort to appease the Court in response to problematic revelations does not hinge on the Court's determination and should have been completed in July 2015, at the time of counsel's representation to the Court.

Mr. Morton brought it home, and she discussed it with him.  She, however, authorized the filing

of the case on her behalf over the phone or through her husband; she did not go the offices of the

Firm before the case was filed; and she did not sign any of her bankruptcy documents before the

case was filed.  Similarly, with respect to documents filed after the case was filed, including the

monthly operating reports and valuation report, Mrs. Morton testified that she also saw and read

through those documents before they were filed.  When questioned by the Court about the Firm's

pre-petition representation of Debtors and their businesses and the fees paid to the Firm, Mrs.

Morton's testimony was similar to Mr. Morton's:  the payments made to the Firm totaling

$6,000.00 were not a retainer but were for past debt owed to the Firm by Debtors for the Firm's

representation of them in two state-court lawsuits, the first a land/contract dispute between a Mr.

Houston and Debtors and the second a dispute with Tennessee State Bank dating back to 2008

concerning property owned by Morton Properties, LLC.  She also testified that the Firm does not

represent her mother, Dixie Bopp, who paid the $15,000.00 retainer on Debtors' behalf.  She

testified that she and Mr. Morton had been paying the same amount per month for some time,

and it was her understanding, prior to the bankruptcy, that although they were making monthly

payments, if they received an award in the Houston lawsuit, it would be used to pay the debt to

the Firm in full.  Mrs. Morton further testified that due to the hurried nature of the filing and the

stress of filing, she did not notice that the debt owed to the Firm was not listed in Debtors'

initially filed bankruptcy schedules even though Debtors knew they owed the debt of

approximately $150,000.00.  She also testified that Debtors did not have any discussions

concerning payment of the claim to the Firm after the bankruptcy case was filed, and she and Mr.

Morton were unaware that it created a problem that the Firm was one of their creditors.  Finally,

Mrs. Morton testified that the Firm had agreed to waive its claim against Debtors at the end of the meeting with the United States Trustee.

Mr. Morton testified that the Firm had represented him for several years in connection with the lawsuits with Mr. Houston and Tennessee State Bank and in negotiations with creditors and tenants.  He testified that he had not paid the Firm a retainer; that the $150,000.00 debt arose from both lawsuits and all prior work done by the Firm; and that the monthly payments were for ongoing services, explaining that he had been making the payments for approximately two years pursuant to an agreement to make the monthly payment, which was intended for both past and current services.[19]  He testified that he did not think about the debt needing to be included in his statements and schedules although he knew it was an outstanding debt.  Mr. Morton also testified that he initially asked Mr. Price whether bankruptcy was an option when Apex Bank first began putting pressure on him for payment, roughly the end of February or the beginning of March 2015, finally making the decision to file on the Friday before the case was filed on Tuesday, and it was at that point when Debtors started pulling together and providing Mr. Price with the information used to file the case.  When asked about the documents filed with his electronic signature, Mr. Morton testified that, even though he had not actually signed them, he felt confident that he had seen and approved for filing the documents filed with the Court on his behalf, including the amended statements and schedules.

At the close of Debtors' testimony, the Court asked questions of Mr. Price and Mr. Tindell, asking first whether the Firm had retainer agreements with Debtors and/or any of their wholly-owned limited liability companies.  In response, Mr. Price answered that the Firm had represented Debtors and their companies in many matters over many years and that the

---

[19] The Court credits Debtors' testimony regarding the purpose of the monthly payments, which is contrary to the Second Amended Declaration of Mr. Price, in which he asserted that the payments were solely for new value.

approximately $150,000.00 debt arose from all of those matters, including the state-court

lawsuits with Mr. Houston and Tennessee State Bank; lawsuits filed against Mr. Morton, Morton

Construction, and/or one of his other companies by vendors and/or contractors; and lease/tenant

disputes.  Mr. Price stated that approximately three years ago, services rendered for all matters

and issues were consolidated into one quarterly bill at Mr. Morton's request, and that Debtors

began paying the $2,000.00 per month before the Firm undertook the Houston and Tennessee

State Bank lawsuits approximately two years ago, although the agreement was never

memorialized in writing.  Mr. Price also insisted that the monthly payments were for current

services because the services performed each month on Debtors' behalf, exclusive of the

bankruptcy matters, exceeded $2,000.00.  When asked why or how it did not occur to him that

the outstanding debt owed to the Firm did not need to be disclosed during the preparation of the

statements and schedules or the application to employ and accompanying declaration, Mr. Price

stated that in the haste to get the bankruptcy case filed, he and his Firm relied on Debtors to

complete the information in the statements and schedules and did not conduct an independent

investigation to ensure their debt was included.  Mr. Price also agreed that neither he, Mr.

Tindell, nor the Firm would seek fees for representation of Debtors in this case.

At the close of the evidentiary hearing, the Court directed Mr. Price and Mr. Tindell to

provide the Court with copies of any and all retainer agreements with Debtors and/or their

limited liability companies, as well as copies of all billing statements sent to Debtors within the

last year, along with a copy of the most recent statement reflecting the total debt owed to the

Firm by Debtors that had been waived by the Firm.  Those documents were filed on July 17 and

are restricted from public access.[20]  Notably, no retainer agreement was produced, nor did

---

[20] The billing statements provided to the Court by Mr. Price are confusing, at best, but seem to reflect an outstanding
debt of $153,114.33 as of November 29, 2013, which the firm denoted as the amount it has waived, but also reflect

counsel produce any document reflecting any agreement between Debtors and the Firm as to the

legal representation, quarterly billing, or monthly payments.

## II.  ANALYSIS

The Court issued the Show-Cause Order pursuant to 11 U.S.C. § 105(a), authorizing it to

"issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of [the Bankruptcy Code]," and Rule 9011 of the Federal Rules of Bankruptcy Procedure which

states, in material part:

> **(a) Signature**
> Every petition, pleading, written motion, and other paper, except a list,
> schedule, or statement, or amendments thereto, shall be signed by at least one
> attorney of record in the attorney's individual name.  A party who is not
> represented by an attorney shall sign all papers.  Each paper shall state the signer's
> address and telephone number, if any.  An unsigned paper shall be stricken unless
> omission of the signature is corrected promptly after being called to the attention
> of the attorney or party.
>
> **(b) Representations to the court**
> By presenting to the court (whether by signing, filing, submitting, or later
> advocating) a petition, pleading, written motion, or other paper, an attorney or
> unrepresented party is certifying that to the best of the person's knowledge,
> information, and belief, formed after an inquiry reasonable under the
> circumstances, –
>> (1) it is not being presented for any improper purpose, such as to harass
>> or to cause unnecessary delay or needless increase in the cost of litigation;
>> (2) the claims, defenses, and other legal contentions therein are
>> warranted by existing law or by a nonfrivolous argument for the extension,
>> modification, or reversal of existing law or the establishment of new law;
>> (3) the allegations and other factual contentions have evidentiary
>> support or, if specifically so identified, are likely to have evidentiary

---

outstanding fees in the amount of $82,792.01 for the period of January 2014 through March 23, 2015.  The 2013
statement relating to "TN State Bank" reflects a different file number than the statements relating to "Tennessee
State Bank – Tortious Interference."  Notably, the November 29, 2013 statement with the same file number as the
statements provided for 2014 and 2015 indicates a balance due of $30,141.10, only thirty-two days before the
beginning of the quarterly statement for the first quarter of 2014, which does not reflect any previous balance due. It
appears from the statements provided, however, that the actual total pre-petition debt owed by Debtors to counsel
approaches $236,000.00.  Also notable is that the last of the monthly payments made by Debtors to the Firm was
March 17, 2015, a mere seven days before the petition was filed and most assuredly while Debtors were being
counseled in earnest by Mr. Price about filing bankruptcy. [Doc. 209-2; 209-3.]

support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

**(c) Sanctions**

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

**(1) How initiated**

. . . .

**(B) On court's initiative**

On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

**(2) Nature of sanction; limitations**

A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated.  Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

(A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

(B) Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.

**(3) Order**

When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.

. . . .

**(f) Copies of signed or verified papers**

When these rules require copies of a signed or verified paper, it shall suffice if the original is signed or verified and the copies are conformed to the original.

Fed. R. Bankr. P. 9011 (footnote omitted).

The Court also looks to the local rules of this Court, which provide:

Every paper submitted for filing must be signed and must include the signer's typed or printed name, mailing address, and telephone number. If the signer is an attorney, the attorney's state bar number (and the state from which the bar number is issued, if other than Tennessee) should also be included. Entry of the user log-in and password required to file papers electronically serves as the filing user's signature on all documents filed with the court electronically for purposes of Fed. R. Bankr. P. 9011, the local rules of this court, and any other purpose for which a signature is required in connection with proceedings before the court.

E.D. Tenn. LBR 9011-4. Further, section III.A.3 of the ECF Administrative Procedures

makes clear:

[A]ny petition, list, schedule, statement, and amendment thereto that requires the debtor's signature may be filed electronically by a Registered User with the debtor's signature indicated as "/s/" followed by the typed name of the debtor, *provided the debtor has actually signed a copy of the document and the filing attorney retains the signed document as required by paragraph 5 below*.

(Emphasis added.) Paragraph 4 of section III.A also relates the requirements to Rule 9011:

"Electronic filing of a verified document by an attorney is a representation for the

purposes of Fed. R. Bankr. P. 9011 that the person or persons required to sign

and verify the document did in fact sign and verify it before it was filed." Finally, section II.D.1

of the ECF Administrative Procedures provides that failure to comply with the procedures may

result in termination of an attorney's privileges to use ECF and/or sanctions by the Court.

Attorneys and other professionals employed in a bankruptcy case pursuant to 11 U.S.C. §

327(a) may not "hold or represent an interest adverse to the estate" and must be "disinterested

persons." Correspondingly, 11 U.S.C. § 328(a) imposes a reasonableness standard on the "terms

and conditions of employment" and compensation to be sought. Section 329 requires attorneys

to file a statement of compensation paid within the preceding year or agreed to be paid in connection with the bankruptcy representation as well as the source of the compensation. Finally, "reasonable compensation for actual, necessary services rendered . . . and reimbursement for actual, necessary expenses" is governed by 11 U.S.C. § 330.

> Together, these sections provide the bankruptcy court with the power and duty to oversee employment and compensation of professionals to protect the estate by: 1) ensuring the trustee or debtor-in-possession is represented by competent, disinterested persons with experience and integrity, and 2) preventing the estate from being drained by unreasonable fees that might otherwise benefit creditors, the debtor, and equity security holders.

*Rose Hill Bank v. Mark J. Lazzo, P.A. (In re Schupbach Invs., LLC)*, 521 B.R. 449, 2014 WL 6680122, at *5, 2014 Bankr. LEXIS 4936, at *18-19 (B.A.P. 10th Cir. Nov. 25, 2014) (citations omitted) (unpublished table decision).

Thus, the bankruptcy court possesses the inherent authority to manage attorney practices before it and to impose sanctions for violation of its local rules. *Dhaliwal v. Singh (In re Singh)*, No. NC-13-1285, 2014 WL 842102, at *8 (B.A.P. 9th Cir. Mar. 4, 2014) ("Authority to impose sanctions in these circumstances is not 'governed by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" (quoting *Hale v. United States Tr.*, 509 F.3d 1139, 1148 (9th Cir. 2007) (citations omitted)). To quote Judge Phillips of the United States Bankruptcy Court for the Eastern District of Virginia, "[o]n occasion, a court must discipline an attorney in order to preserve the integrity of the bankruptcy system and the court and to protect the general public from abusive practices and unprofessional conduct of attorneys. Unfortunately, this case presents such an occasion." *In re Smith*, No. 13-31565-KLP, 2014 WL 128385, at *1, 2014 Bankr. LEXIS 135, at *1 (Bankr. E.D. Va. Jan. 14, 2014).

A.    **Incompetence**

Notwithstanding the statement in each iteration of the application to employ filed by Mr.

Price, Mr. Tindell, and the Firm that "[s]aid attorneys have significant experience with regard to

bankruptcy, reorganization and other matters under the Bankruptcy Code and Rules" [Doc. 31 at

¶ 4; Doc. 39 at ¶ 5; Doc. 78 at ¶ 5], from the commencement of this bankruptcy case, Mr. Price

and Mr. Tindell have made a series of clerical and procedural mistakes, have failed to fully abide

by directives of the Court, have repeatedly failed to timely file documents without clerk or court

intervention, and have repeatedly violated the Court's ECF Administrative Procedures and local

rules.

> [A]n attorney hoping to represent a Chapter 11 debtor must have more than just
> integrity; that counsel must also have a strong knowledge of technical
> requirements under the Bankruptcy Code.
>
> > In a Chapter 11 case, an attorney can provide competent representation to
> > the estate only if the attorney is thoroughly familiar with the Bankruptcy
> > Code, the Bankruptcy Rules, and the Local Rules.  Bankruptcy, and
> > especially Chapter 11 bankruptcy, is a highly specialized area of law.  An
> > attorney for a debtor in possession must have expert knowledge of
> > bankruptcy law in order to achieve a successful result.  Experience
> > indicates that a business that files a Chapter 11 case, by definition, is
> > already in trouble  ...[.]  Only an attorney with expert knowledge of
> > bankruptcy law can properly aid in the administration of the case.

In *re Vettori*, 217 B.R. 242, 245 (Bankr. N.D. Ill. 1998) (quoting *In re Doors and More, Inc.*, 126

B.R. 43, 45 (Bankr. E.D. Mich. 1991) (alteration in original)); *see also In re Wiley Brown &*

*Assoc., LLC*, No. 06-50886, 2006 WL 2390290, at *8, 2006 Bankr. LEXIS 1975, at *22 (Bankr.

M.D.N.C. Aug. 14, 2006) (denying approval of employment application because attorney had

not "demonstrated an extensive knowledge of the Bankruptcy Code, the Federal Rules of

Bankruptcy Procedure, or the Local Rules of this Court" in addition to having a conflict of

interest); *In re Ricasata*, Nos. 10-44101T, 10-45356T, 2010 WL 2816330, at *2, Bankr. LEXIS

23

2389, at *5 (Bankr. N.D. Cal. July 16, 2010) (stating that "the Court has a duty to deny approval

of the employment of counsel by chapter 11 debtors-in-possession on grounds of incompetence,

among other things").  This competency requirement is also found in the Tennessee Rules of

Professional Conduct, which require lawyers to "provide competent representation to a client.

Competent representation requires the legal knowledge, skill, thoroughness, and preparation

reasonably necessary for the representation."  Tenn. S. Ct. R. 8, RPC 1.1.

　　　As detailed above, from the beginning of this bankruptcy case, Mr. Price and Mr. Tindell

made a series of errors and violations of the local rules and ECF Administrative Procedures.

Between the March 24 filing date and June 25, the Court entered eleven show-cause, deficiency,

or rejection orders directed to Mr. Price and Mr. Tindell on matters including but not limited to

the failure to provide for an appropriate top margin on orders, the failure to include a referenced

mailing matrix with a certificate of service, the failure to certify service and/or file amended

certificates of service, the failure to timely file monthly operating reports, and the need to file

amended documents, culminating with the Show-Cause Order entered on June 24 and the show-

cause order related to disqualification concerns entered on June 25.[21]  In addition, the clerk's

office was required to send a deficiency memorandum to Mr. Price concerning the filing of a

compensation disclosure statement and to correct docket entries in which Mr. Price erroneously

inserted a hearing date when the motions contained a passive-notice legend.  Similarly, rather

than upload an order concerning employment as directed by the Court, a "tendered proposed

order" was inappropriately filed on the Court's docket.  Several early case filings[22] contained

---

[21] As noted above, a twelfth show-cause order was entered on August 27, 2015, directing Mr. Price and Mr. Tindell to also appear at the show-cause hearing on the application for compensation filed by Charles M. Smith and Property Service Group Southeast, Inc.

[22] Because the Court observed the numerous early problems, after a hearing on May 7, the Court informally counseled Mr. Price about the ongoing problems and strongly suggested that he carefully read and follow the Court's local rules.

duplicate versions of the main documents filed as exhibits.  These deficiencies and failures also

resulted in the filing of the Motion to Dismiss by the United States Trustee in which he sought

dismissal, conversion, or at the very least, an order compelling future compliance.

In the Court's view, the cumulative number of these errors and violations alone would be

sufficient cause for disgorgement of at least a portion of fees under § 105(a).  *See, e.g., In re*

*Wilde Horse Enters., Inc.*, 136 B.R. 830, 844 (Bankr. C.D. Cal. 1991) ("The Court may deny an

attorney for a Chapter 11 debtor all fees claimed as due and owing on account of such attorney's

wrongdoing, negligence, or serious breaches of fiduciary obligations. . . .  While ethical

violations are a factor to be considered by the court on fee applications, the *absence of*

*competence* should be the *primary* focus . . . ." (emphasis in original)).  The presence here of two

ethical violations, as discussed below, in addition to the numerous errors and rules violations,

more than satisfy the Court that there is sufficient cause to require disgorgement of all fees and

to impose sanctions in the form of requiring both attorneys to attend continuing legal education

programs focusing on ethical considerations and to self-report to the Tennessee Board of

Professional Responsibility.

## B.     Unsigned Documents

Of significant concern is the failure of Mr. Price and Mr. Tindell to obtain Debtors'

signatures on their bankruptcy documents before they were filed with the Court, as is very

clearly required under numerous provisions of the Bankruptcy Code, local rules, and ECF

Administrative Procedures.  All bankruptcy petitions, statements, schedules, and amendments are

required under Rule 1008 of the Federal Rules of Bankruptcy Procedure to be verified or contain

an unsworn declaration by debtors.  The documents expressly state that they are signed under

penalty of perjury.  "The purpose of a debtor's signature on a petition is to verify that the facts

contained in the petition are correct." *Briggs v. LaBarge (In re Phillips)*, 317 B.R. 518, 523

(B.A.P. 8th Cir. 2004).  Additionally, "the evidentiary support for the information in a petition

comes from the debtor's signing of the petition under penalty of perjury.  When documents

requiring the debtor's original signature are not signed by the debtor, the evidentiary basis for the

information in those documents no longer exists."  *In re Veluz*, No. 14-20101 (DHS), 2015 WL

161002, at *4, 2015 Bankr. LEXIS 102, at *12 (Bankr. D.N.J. Jan. 9, 2015) (internal citations

omitted).

The Court's ECF Administrative Procedures, which have been effective since May 2005

and are authorized by Rule 5005(a)(2) of the Federal Rules of Bankruptcy Procedure, contain the

following pertinent requirements:

> 2.  *Signatures on Affidavits, Declarations, Verified Documents, and Reaffirmation Agreements*
>
> Except as provided in paragraph 3 immediately below, each affidavit, unsworn declaration under penalty of perjury, verified document, or reaffirmation agreement filed or submitted for filing must contain actual handwritten signatures. The "/s/" type of signature is not permitted on these types of documents. Registered Users filing such documents should scan and file them electronically after they have been signed (and, in the case of an affidavit, signed by the notary public and affixed with a notarial seal).
>
> 3.  *Signature of Debtor on Petition, Lists, Schedules, Statements, and Other Documents*
>
> Notwithstanding paragraph 2 immediately above, any petition, list, schedule, statement, and amendment thereto that requires the debtor's signature may be filed electronically by a Registered User with the debtor's signature indicated as "/s/" followed by the typed name of the debtor, provided the debtor has actually signed a copy of the document and the filing attorney retains the signed document as required by paragraph 5 below.

4. *Attorney Representation*

Electronic filing of a verified document by an attorney is a representation for the
purposes of Fed. R. Bankr. P. 9011 that the person or persons required to sign and
verify the document did in fact sign and verify it before it was filed.

5. *Retention of Documents*

With respect to the documents described in paragraph 3 above, original
documents bearing the debtor's actual signature must be maintained in paper form
by the filing attorney until two years after the closing of the case.  On request of
the court, the attorney must provide such documents for review.

ECF Admin. Procedures at § III.A.  Clearly, these provisions allow attorneys to file documents

with electronic signatures only after the originals have been executed under penalty of perjury.

Moreover, section III.A expressly imposes a duty under Rule 9011 to ensure that documents filed

were, in fact, verified.  *See In re Veluz*, 2015 WL 161002, at *2-3, 2015 Bankr. LEXIS 102, at

*6.

The Court has no difficulty holding that the failure of an attorney to ensure that a debtor

reviews, verifies, and signs statements and schedules, even when those documents are to be filed

electronically, constitutes a violation of Rule 9011.  As artfully stated last year by the

Bankruptcy Court for the Middle District of Florida,

Bankruptcy Rule 9011 requires attorneys to sign many documents, but,
when read in conjunction with Bankruptcy Rule 1008, Rule 9011 "specifically
prohibits attorneys from signing a debtor's name to the lists, schedules and
statement of financial affairs." *In re Wenk*, 296 B.R. 719, 727 (Bankr. E.D. Va.
2002). . . .  The filing of a petition, schedules, or amendments of schedules with a
debtor's purported signature where the debtor never reviewed or signed the
document violates Bankruptcy Rule 9011 because "there could not have been a
belief that the filing of a petition with what amounts to a forged debtor's signature
(or a petition with no signatures for that matter) was proper or warranted under
existing law or a good faith argument to extend the law." *Wenk*, 296 B.R. at 728.
"[T]he debtor's signature on the original bankruptcy petition does more than
simply authorize the petition's filing; it also verifies, under penalty of perjury, that
the information in the petition is correct." *In re Phillips*, 433 F.3d 1068, 1071 (8th
Cir. 2006).

The altered [Declaration Under Penalty of Perjury for Electronic Filing "DEF"], which represented that Shipley's clients had verified the documents listed on the DEF when they had not, similarly violated Bankruptcy Rule 9011 — Shipley could not have believed this practice was proper or warranted under existing law or a good faith argument to extend the law. Fed. R. Bankr. P. 9011(b)(2).  Shipley's practice of affixing a client's prior signature to amendments of their schedules, effectively misrepresenting that the client had reviewed the information contained in those documents and that the information was accurate and truthful, amounted to forging his client's signature on those documents.

The importance of debtors actually reviewing petitions, schedules, lists, and any amendments cannot be minimized, for both practical and policy reasons. Practically speaking, as the late Judge Alexander Paskay stated, "[i]t takes no elaborate discussion to point out the obvious that no one can grant authority to verify under oath the truthfulness of statements contained in the documents and to verify facts that they are true when the veracity of these facts are unique and only within the ken of the declarant." *In re Harrison*, 158 B.R. 246, 248 (Bankr. M.D. Fla. 1993).  That is, logically speaking, a debtor's attorney simply cannot file a document with the statement that his client has affirmed the truth of the matters asserted in the pleading without the client actually having reviewed the document. *Wenk*, 296 B.R. at 727 ("Logic dictates that only the debtor can state under oath that the information provided in his or her petition is true and correct.").  Merely providing the client a copy after or concurrent with the document's filing does not suffice.

At bottom, the Court's primary concern is more fundamental.  The Bankruptcy Code and the integrity of the Bankruptcy Court relies on debtors providing honest and accurate information regarding their financial affairs before they can reap the substantial benefits of a discharge.  As discussed above, the law is quite clear that debtors, not their attorneys alone, must review the petition, schedules, lists, and all amendments and verify that the information is accurate. The Court in turn relies on these verifications when denying a dishonest debtor's discharge or forwarding a criminal referral for perjury to the U.S. Attorney for prosecution.

*In re Whitehill*, 514 B.R. 687, 691-92 (Bankr. M.D. Fla. 2014) (footnotes omitted with citations added).

As is made clear by our local rules and the ECF Administrative Procedures, "[w]hen an attorney files a document purportedly containing the debtor's signature, he is representing to the court that he has secured the original executed document before filing it electronically.  The

electronic submission of a document by an attorney who falsely represents that the document has been signed by the debtor 'is no different than [the attorney] physically forging the debtor's signature and handing [it] over the counter to the clerk.'" *In re Smith*, No. 13-31565-KLP, 2014 WL 128385, at *4, 2014 Bankr. LEXIS 135, at *14 (Bankr. E.D. Va. Jan. 14, 2014) (quoting *In re Wenk*, 296 B.R. at 725 (alterations in original)); *see also In re Dobbs*, 535 B.R. 675, 688 (Bankr. N.D. Miss. 2015) (quoting *In re Stomberg*, 487 B.R. 775, 815 (Bankr. S.D. Tex. 2013)).

Taking it one step further (in light of Debtors' acknowledgment that they authorized the filing of documents that they had not signed), this Court agrees with the following analysis and determinations of the Bankruptcy Court for the Southern District of Texas, following precedent of the Bankruptcy Appellate Panel for the Eighth Circuit, that it is always a violation of Rule 9011 and the ECF Administrative Procedures for an attorney to file on behalf of a debtor a petition or documents requiring verification without first obtaining the debtor's signature on the originals.

Here, Braun knowingly filed documents (i.e., the Debtor's original Schedules and original SOFA) for which he does not have—and never has had—the Debtor's "wet signatures." [Finding of Fact Nos. 26 & 33]. Thus, the Debtor never verified the accuracy of the information contained in the original Schedules and original SOFA. And, even if the Debtor had signed a prior draft of the Schedules and SOFA and then *authorized* Braun over the phone on the evening of January 7, 2011 to make changes and file these documents, Braun still did not obtain the Debtor's signature on the changes to Schedules B and C. [Finding of Fact Nos. 29 & 33]. As the court in *Phillips* noted, "[t]he issue is not whether the debtor *authorized* the filing of a petition, but whether she *signed* the petition that was filed," because the signature is not only authorization to file, but verification that the information provided is correct. *In re Phillips,* 317 B.R. at 523.

Further, this Court agrees with the court in *Phillips* that there are no circumstances that would ever justify an attorney filing a petition, any of the Schedules, or the SOFA without first obtaining the debtor's signature, "regardless of how urgent the need may appear to be." *See In re Phillips,* 317 B.R. at 521 (refusing to accept attorney's excuse that filing petition without first obtaining the debtor's signature was necessary to prevent a foreclosure sale of the debtor's home). Therefore, it is immaterial whether the changes that Braun made to

> Schedules B and C on the evening of January 7, 2011 were *de minimis,* or that the
> Debtor was unable to come into the Firm's office at that time to sign off on the
> changes, or even that January 7, 2011 was the deadline for filing the Schedules
> and SOFA.  These circumstances do not excuse Braun from obtaining the
> Debtor's "wet signatures" on any changes that Braun made to the Schedules.
> Without the Debtor's signature to verify that the information in the Schedules and
> SOFA was correct, "the factual contentions have no evidentiary support."  By
> filing the Schedules and SOFA on January 7, 2011 at 8:06 P.M. without the
> Debtor's signatures, Braun violated Rule 9011(b)(3).

*In re Stomberg*, 487 B.R. 775, 807-08 (Bankr. S.D. Tex. 2013) (emphases in original) (footnote

omitted); s*ee also In re Bradley*, 495 B.R. 747, 780 (Bankr. S.D. Tex. 2013) ("[T]his court

reaffirms its agreement with the court in *Phillips* that there are no circumstances that would ever

justify an attorney filing a petition, any Schedule, or a SOFA without first obtaining the debtor's

signature, 'regardless of how urgent the need may appear to be.'" (quoting *Phillips*, 317 B.R. at

521)).

Thus, while there might be a measure of leniency available to counsel in the fact that both

Mr. and Mrs. Morton acknowledged that they had reviewed and authorized the filing of the

various documents, the Court finds intolerable Mr. Price's and Mr. Tindell's conduct in filing the

documents without first having procured their clients' actual signatures.  Simply, there is no

justifiable reason for their failure to obtain Debtors' signatures on their bankruptcy petition,

statements, schedules, and amendments before filing them.  Although Mr. Morton testified that

he finally decided to file a bankruptcy case on the Friday before it was filed mid-day on Tuesday,

only the Voluntary Petition was actually filed on March 24.  The Social Security Number

Certifications, List of Creditors Holding 20 Largest Unsecured Claims, and Verification of

Creditor Matrix, with matrix attached, were filed on Wednesday, March 25, and Debtors'

Statement of Financial Affairs; Schedules A, B, D, E, F, G, and H; Exhibit D – Individual

Debtor's Statement of Compliance With Credit Counseling Requirement for both Debtors; the

Statistical Summary of Certain Liabilities and Related Data; and the Certification of Notice to

Consumer Debtor(s) Under § 342(b) of the Bankruptcy Code were not filed until Thursday,

March 26. At the very least, Mr. Price and Mr. Tindell had the better of two business days to

meet with both Debtors to review and sign the petition before it was filed, and even more time

for them to sign the remaining documents filed over the course of the following two days.

Nevertheless, it was only at the direction of the Court after confirming on June 23 that Debtors

had never signed the first document that Debtors signed their bankruptcy documents.[23] The

Court finds that the filing of the Voluntary Petition, Debtors' statements and schedules, and the

amendments thereto by counsel without first obtaining Debtors' signatures constitutes a forgery

of those documents by counsel. Their actions in doing so were inexcusable and are sanctionable

violations of the ECF Administrative Procedures as well as Rule 9011(b)(3).[24]

### C.    Non-Disclosures

An equally disturbing ethical issue is the repeated failure by Mr. Price, Mr. Tindell, and

the Firm to disclose all connections with Debtors –the outstanding claim in the amount of more

than $150,000.00, payments totaling $6,000.00 received from Debtors within the three months

preceding the bankruptcy filing, and the receipt of the $15,000.00 retainer from Mrs. Morton's

mother – which presented potential conflicts of interest and constituted unquestionable violations

of the Bankruptcy Code and Rules. Professionals may be authorized for employment under 11

U.S.C. § 327(a) only if they "do not hold or represent an interest adverse to the estate, and . . .

are disinterested persons." Disinterested persons are defined by the Bankruptcy Code as "a

---

[23] Debtors' eventual execution of their petition, statements, and schedules constituted ratification: acceptance of the benefits of the act with full knowledge of the facts and actively participating in their bankruptcy case. *See Simon v. Amir (In re Amir)*, 436 B.R. 1, 18 (B.A.P. 6th Cir. 2010). The Court finds that Debtors bear no fault in their failure to verify their petition, statements and schedules, amendments, and other documents before filing them.

[24] Also implicated is Rule 8, RPC 3.3(a)(1) of the Tennessee Supreme Court Rules, which prohibits a lawyer from knowingly making false statements of fact or law to the Court. The filing of documents that were, for all practical matters, forged by counsel clearly constitutes false statements of fact before this Court.

person that – is not a creditor . . . and does not have an interest materially adverse to the interest

of the estate or of any class of creditors or equity security holders, by reason of any direct or

indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11

U.S.C. § 101(14).  As explained very recently,

> Section 327(a) sets forth two requirements:  1) counsel must "not hold or
> represent an interest adverse to the estate" and 2) must be a "disinterested
> person." *In re 7677 E. Berry Ave. Assoc., LP*, 419 B.R. 833, 841 (Bankr. D. Colo.
> 2009) (citing *In re Cook*, 223 B.R. 782, 789 (B.A.P. 10th Cir. 1998)).  "Together,
> the statutory requirements of disinterestedness and no interest adverse to the
> estate serve the important policy of ensuring that all professionals appointed
> pursuant to section 327(a) tender undivided loyalty and provide untainted advice
> and assistance in furtherance of their fiduciary responsibilities." *Id*. (citing *In re
> Crivello*, 134 F.3d 831, 836 (7th Cir. 1998) (internal quotation omitted)).  "The
> propriety of employment under § 327 must be examined on a case-by-case basis."
> *Id*. at 844.

*In re US Bentonite, Inc.*, ___ B.R. ___, No. 13-20211, 2015 WL 5179425, at *6, 2015 Bankr.

LEXIS 2974, at *17 (Bankr. D. Wyo. Sept. 3, 2015) (emphasis in original) (footnotes omitted,

citations inserted).

"An attorney holds an adverse interest to the estate if he or she (1) possesses or asserts

'any economic interest that would tend to lessen the value of the bankruptcy estate or that would

create either an actual or potential dispute in which the estate is a rival claimant' or (2) possesses

'a predisposition under circumstances that render such a bias against the estate.'" *In re Belmonte*,

524 B.R. 17, 27 (Bankr. E.D.N.Y. 2015) (quoting *Bank Brussels Lambert v. Coan (In re

AroChem Corp.),* 176 F.3d 610, 623 (2d Cir.1999) (internal citations omitted)).  "More

generally, it includes any interest or relationship, however slight, that would even faintly color

the independence and impartial attitude required by the Code and Bankruptcy Rules."  *In re

Keller Fin. Servs. of Fla., Inc.*, 243 B.R. 806, 812 (Bankr. M.D. Fla. 1999) (citations and internal

quotation marks omitted).

Section 327 is supplemented by Rule 2014 of the Federal Rules of Bankruptcy Procedure, which requires professionals seeking employment to file an application that states the name of the applicant, the specific facts necessitating the representation, the services to be rendered, compensation arrangements, and all of the applicant's connections with the debtor, creditors, and any other party in interest. To further accomplish these required disclosures, "[t]he application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any other person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014(a). The requirements imposed by Rule 2014 "are more-encompassing than those governing the disinterestedness inquiry under section 327." *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y.).

Because it is the responsibility of the Court, not the professional seeking employment, to determine whether past or current connections with a debtor rise to the level of a potential or actual conflict of interest, all of the professional's contacts must be disclosed. *See Miller Buckfire & Co., LLC v. Citation Corp. (In re Citation Corp.)*, 493 F.3d 1313, 1321 (11th Cir. 2007). Indeed, it is disingenuous and unmeritorious for a party to argue that it "did not have to disclose its connections . . . because its attorneys did not feel that a conflict existed." *In re Leslie Fay Cos., Inc.*, 175 B.R. at 536; *see also In re Kappy Invs., Inc.*, 465 B.R. 839, 842 (Bankr. D. Minn. 2012) ("When an attorney fails to disclose relationships and facts necessary for the Court to make a determination as to whether they meet the requirements of the Code, three explanations may be inferred: oversight or negligence, failure to understand the importance of proper disclosure, or an intent to circumvent the Code." (citations omitted)); *In re Keller Fin. Servs. of Fla., Inc.*, 243 B.R. at 812 ("The professional must disclose all facts that bear on his

disinterestedness, and cannot usurp the court's function by unilaterally choosing which

connections impact on his disinterestedness and which do not.").

    "These disclosure requirements are not discretionary." *Winship v. Cook (In re Cook)*, 223

B.R. 782, 790 (B.A.P. 10th Cir. 1998) (citing *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D.

Okla. 1992) (holding that professionals seeking employment "cannot pick and choose which

connections are irrelevant or trivial")).

> [C]ounsel for a debtor in possession has a fiduciary duty to the estate, requiring
> that he or she exercise independent professional judgment on behalf of the estate.
> *Jensen v. United States Tr. (In re Smitty's Truck Stop, Inc.),* 210 B.R. 844, 850
> (10th Cir. BAP 1997); *see Interwest Bus. Equip., Inc. v. United States Tr. (In re
> Interwest Bus. Equip., Inc.),* 23 F.3d 311, 316 n.9 (10th Cir. 1994) (debtor in
> possession is also a fiduciary of the estate).  Failure to properly exercise that
> independent professional judgment may result in a total denial of fees. *Smitty's
> Truck Stop,* 210 B.R. at 850.  Counsel's fiduciary duty includes its responsibility
> to disclose any actual or potential conflicts of interest with the estate[.] *[I]d.*

*Jensen v. United States Tr. (In re Double J Cattle Co.)*, 226 B.R. 284, 1997 WL 837762, at *8,

Bankr. LEXIS 1738, at *27 (B.A.P. 10th Cir. Oct. 24, 1997 (unpublished table decision).

    Moreover, Rule 2014(a)'s disclosure requirements continue throughout the representation

such that if an employed professional becomes aware of a potential or actual conflict of interest

that arises after employment is authorized, counsel has a duty to file a supplemental disclosure

statement.

> The required supplemental disclosure allows the Court, not counsel, to determine
> whether a conflict exists and counsel remains disinterested under § 327(a).
> Failing to make a supplemental disclosure robs the Court [of] the power to make
> such a determination.

    The Tenth Circuit BAP explained the penalty for failing to fully disclose
connections in violation of Rule 2014(a):

> "'Given that the duty is upon the attorney to "divulge conflicts, and
> not upon the client to ferret them out", the attorney should ... evaluate
> for himself, as well as for his client, any potential for impropriety that
> might arise....'" *In re Amdura Corp.*, 139 B.R. 963, 978 (Bankr. D.

> Colo. 1992) (quoting *In re King Resources Co.,* 20 B.R. 191, 201 (D.
> Colo. 1982)).  In fulfilling this duty, the attorney has a duty to fully
> disclose any connections with the debtor or creditors that might create
> a possible conflict, and all fee arrangements with the debtor in
> possession.  *Interwest,* 23 F.3d at 316 n.9; *In re Bonneville Pac. Corp.,*
> 196 B.R. 868, 886 (Bankr. D. Utah 1996). ***Failure to disclose***
> ***connections that have the potential for creating a conflict warrants a***
> ***denial of all compensation to debtor's counsel.*** *Interwest,* 23 F.3d at
> 318.

> *Smitty's Truck Stop*, 210 B.R. at 850.

*In re US Bentonite, Inc.*, ___ B.R. at ___, 2015 WL 5179425, at *7, 2015 Bankr. LEXIS 2974, at

*19-20 (emphasis in original) (footnotes omitted, citations inserted).

> It is equally important in terms of policy that these rules are also meant to
> preserve the integrity of the bankruptcy system.  Therefore, in addition to
> avoiding conflicts detrimental to a particular case, the rules were drafted to avoid
> conflicts and questionable relationships that had historically cast the bankruptcy
> system itself in an unfavorable light.

*In re Sundance Self Storage-El Dorado LP*, 482 B.R. 613, 625-26 (Bankr. E.D. Cal. 2012); *see*

*also In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992) ("Compliance with these

requirements is necessary to maintain the integrity of the bankruptcy system.").  Because of the

important policy considerations, "[v]iolation of the disclosure rules alone is enough to disqualify

a professional and deny compensation, regardless of whether the undisclosed connections or fee

arrangements were materially adverse to the interests of the estate or were *de minimis.*" *In re*

*EWC, Inc.*, 138 B.R. at 280.

As for the disclosure required by § 329 concerning the "compensation paid or agreed to

be paid, . . . and the source of such compensation," Rule 2016(a) also requires the attorney to file

an application that includes "a statement as to what payments have heretofore been made or

promised . . . , [and] the source of compensation so paid or promised."  As with § 327, the

disclosure requirements of § 329 are mandatory, not permissive.  *See In re Cook*, 223 B.R. 782,

790 (B.A.P. 10th Cir. 1998).  The disclosure is designed to promote the exercise of a fully

informed, independent judgment by any party in interest about the effect on the estate of any

given payment.  *See In re Rio Valley Motors Co. LLC*, No. 11-06-11866 SS, 2007 WL 2492685,

at *2, 2007 Bankr. LEXIS 3001, at *7-*8 (Bankr. D.N.M. Aug. 29, 2007); *see also Hancock v.

Limor (In re Innovative Entm't Concepts, Inc.)*, No. 3:07-0639, 2007 WL 4481436, at *6 (M.D.

Tenn. Dec. 18, 2007) (affirming the bankruptcy court's sanction of an attorney who engaged in

"shifting disclosures" where candor was required).

This bankruptcy case has been wrought with failure on the part of Mr. Price and Mr.

Tindell to fully disclose their connections with Debtors and Debtors' insiders.  The Court

recognizes "that there may be occasional innocent errors and omissions.  There comes a point,

however, when such errors and omissions 'are simply too numerous and substantial to

overlook.'" *In re Jakovljevic-Ostojic*, 517 B.R. 119, 130 (Bankr. N.D. Ill. 2014) (quoting *Davis,

Mannix & McGrath v. Fawell (In re Fawell)*, No. 98 B 01274, 1999 WL 549449, at *13, 1999

Bankr. LEXIS 891, at *36-37 (Bankr. N.D. Ill. July 26, 1999)).  As an initial matter, counsel

failed to file their compensation disclosure statement at the commencement of the case, and it

was only after the clerk's office sent a deficiency memo dated March 27, directing Mr. Price to

file it within fourteen days, that it was subsequently filed on the fourteenth day, April 7.  The

disclosure statement, however, did not comply with § 329(a) and Rule 2016 because it failed to

identify the source of the retainer as Mrs. Morton's mother, Dixie Bopp, indicating only that it

was a "family member."  Such was an important piece of information because, as revealed for

the first time at the June 23 trial on the Motion for Stay Relief, Ms. Bopp is also one of Debtors'

creditors (for a debt unrelated to the retainer).

Most alarming were the failures to disclose the financial connections the Firm had with

Debtors.  First, Mr. Price and Mr. Tindell did not disclose in the initial Application to Employ

filed on April 2, or in the Amended Application to Employ filed on April 6, the more than

$150,000.00 of pre-petition debt that was owed to the Firm by Debtors for prior legal fees, nor

was this debt listed in Debtors' Schedule F.  This claim was discovered only after Debtors

testified at their May 8 meeting of creditors that they owed pre-bankruptcy attorneys' fees to the

Firm.  And, only after it was disclosed by Debtors and called to the attention of the Court

through the objection to employment filed by the United States Trustee on May 11 did the Firm

finally formally disclose the debt and confirm that it was waived in the Second Amended

Application to Employ filed on May 20.  Because this claim was not disclosed by counsel before

the Second Amended Application to Employ, the Court approved employment *nunc pro tunc*

only to May 20, believing that, at that point, "all material information concerning the

disinterestedness of counsel" had been disclosed. [Doc. 83.]

Such was not the case, however, and the Court learned for the first time during Mr.

Morton's testimony at the June 23 stay-relief trial that Debtors had paid at least $4,000.00 to the

Firm during the ninety days preceding the bankruptcy filing, an amount later confirmed as

$6,000.00.  These payments, likewise, were not originally disclosed in Debtors' statements and

schedules, although they were listed in the Amended Statement of Financial Affairs filed on June

29.  Following the issuance of the Court's June 24 and June 25 show-cause orders and the June

25 order directing Mr. Price to file a Second Amended Unsworn Declaration containing his

original signature, Mr. Price filed another declaration and disclosed, for the first time, "out of an

abundance of caution," that the Firm had received $6,000.00 in payments within the ninety days

before filing the case.  Mr. Price represented that the payments were "the same monthly

payments made for more than one (1) year prior to filing the Petition in this case and were partial payments and in the ordinary course for new value of the work being performed contemporaneously by the Firm for services unrelated to this proceeding." [Doc. 176 at ¶ 3.]  As discussed above, however, Debtors understood that the monthly payments were for past debt, even though they were continuing to incur additional debt for ongoing representation by the Firm.

The failures to disclose these very significant connections with Debtors violate not only the letter of the law in § 327 and Rule 2014(a), but they vitiate the integrity of the system.  The Court, the United States Trustee, other counsel, and debtors themselves must be confident in the disclosures and representation of professionals being employed to represent debtors and bankruptcy estates.  Unfortunately, such was never the case concerning Mr. Price and Mr. Tindell.  Even after the United States Trustee raised the issue with respect to the initial outstanding claim that was later waived by the Firm, Mr. Price and Mr. Tindell failed to disclose other payments the Firm had received from Debtors and, instead, continued to aver their disinterestedness.  The Court gave them the benefit of the doubt with respect to the first failure to disclose and granted the application to employ; however, once the question of their disinterestedness arose, counsel should have recognized a higher expectation of full and complete disclosure.  Accordingly, the Court does not ascribe to counsel an innocent motive for their continued failures to disclose.  Rather than proceed as they did by not making any additional disclosures until the truth was revealed unexpectedly, Mr. Price and Mr. Tindell should have made every effort to disclose any and all connections they and the Firm had with Debtors, which would have allowed the Court to make a fully informed determination whether there were material conflicts of interest that would have disallowed their employment.  The same

can be said of their preparation of an inadequate disclosure declaration for Charles M. Smith in support of Debtors' application to employ him and his firm as an appraiser.

Counsel's repeated nondisclosure and noncompliance resulted in a waste of judicial resources by the clerk's office, which was required to notify the Firm of delinquent filings and to edit docket entries that were incorrectly entered by Mr. Price, and by the Court, which was forced to issue a number of show-cause orders, denials, and rejections, as well as a waste of time expended by the United States Trustee and his staff having to file a number of motions and responses.[25]  Such misfeasance compels a sanction by the Court.

## III. CONCLUSION

For the foregoing reasons, the Court determines that sanctions are appropriate. Accordingly, Mr. Price, Mr. Tindell, and the Firm shall be required to disgorge all monies paid to them in connection with Debtors' bankruptcy case, including the $15,000.00 retainer that they voluntarily agreed to disgorge in the Response to Show-Cause Order filed on July 10, 2015, and the $6,000.00 paid to them by Debtors in the ninety days before the bankruptcy filing.  Also, Mr. Price, Mr. Tindell, and the Firm shall not be entitled to payment of any fees or expenses incurred in connection with their representation of Debtors in this bankruptcy case.  Additionally, because they waived the pre-petition claim owed by Debtors, they will not be allowed to participate in Debtors' bankruptcy case as a creditor, nor will this Court approve employment of them in any capacity in or related to Debtors' case.  Furthermore, because of the ethical considerations implicated by Mr. Price's and Mr. Tindell's actions, the Court finds that they require additional continuing legal education.  Thus, the Court also requires that both Mr. Price and Mr. Tindell,

---

[25] Once again, Rule 8, RPC 3.3(a)(1) of the Tennessee Supreme Court Rules, which prohibits a lawyer from knowingly making false statements of fact or law to the Court, is implicated.  Mr. Price repeatedly filed declarations under penalty of perjury stating that he and the Firm held no adverse interests to Debtors when, in fact, the firm was a creditor of Debtors.  The Court easily finds the repeated nondisclosure of these material facts to fall within the scope of RPC 3.3(a)(1) prohibiting the making of false statements of fact and law to the Court.

within the next six months, attend ten hours of ethics continuing legal education in addition to

the standard requirements imposed by the State of Tennessee.  Each attorney shall provide proof

of such attendance to the Court *in camera* no later than March 31, 2016.  Finally, both Mr. Price

and Mr. Tindell shall self-report their conduct in this case and this Court's Memorandum

Opinion to the Tennessee Board of Professional Responsibility on or before November 2, 2015,

and provide evidence of such submission (including but not limited to a copy of the documents

submitted) to this Court *in camera* on or before November 30, 2015.

      An Order consistent with this Memorandum will be entered.

FILED:  September 30, 2015

      BY THE COURT

      /s/ *Suzanne H. Bauknight*

      SUZANNE H. BAUKNIGHT
      UNITED STATES BANKRUPTCY JUDGE